# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**STEPHANIE ELAINE HOLDER,**

       **Plaintiff,**

**v.**                                       **Case No.: 3:16-cv-08760**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,[1]**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 15, 16).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action.

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.     Procedural History

On May 13, 2011, Plaintiff Stephanie Elaine Holder ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of January 15, 2011, (Tr. at 340, 344), due to "Club foot [and] Learning disabilities." (Tr. at 402). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 188, 196, 199). Claimant filed a request for an administrative hearing, which was held on October 19, 2012, before the Honorable LaRonna Harris, Administrative Law Judge. ("ALJ Harris").   (Tr. at 82-108). A supplemental hearing for the purpose of testimony by a vocational expert was conducted on March 26, 2013. (Tr. at 73-81). By written decision dated April 12, 2013, ALJ Harris found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 169-178). On July 3, 2014, the Appeals Council remanded the case to the Administrative Law Judge for review of the decision. (Tr. at 184-186). ALJ Harris was no longer employed at the Huntington, West Virginia office; therefore, the Honorable John Molleur, Administrative Law Judge, ("ALJ" or "ALJ Molleur") conducted a third administrative hearing on April 16, 2015. (Tr. at 40-72). By written decision dated July 17, 2015, ALJ Molleur found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 19-33). The ALJ's decision became the final decision of the Commissioner on August 12, 2016,

when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 13, 14). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 15), and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 16). Consequently, the matter is fully briefed and ready for resolution.

## II.     **Claimant's Background**

Claimant was 40 years old at the time that she filed the instant applications for benefits, and 44 years old on the date of the ALJ's decision. (Tr. at 19, 340, 344). She has a high school education and communicates in English. (Tr. at 401-402). Claimant has prior work experience as a cleaner in a fast food restaurant, daycare worker, and telemarketer. (Tr. at 49, 60-63, 403).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining

whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific

job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity.

*Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2013. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since January 15, 2011. (Tr. at 21, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "congenital talipes of the left foot (club foot); obesity; degenerative disc disease of the cervical and lumbar spine; mild thoracic scoliosis; borderline intellectual functioning; major depressive disorder; and generalized anxiety disorder." (Tr. at 21-23, Finding No. 3). The ALJ considered, but found non-severe, Claimant's learning disorder, Gilles de la Tourette Disorder, and seizures. (Tr. at 22-23, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 23-25, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant should avoid climbing on ladders, ropes, and scaffolds; she can perform all other

postural activities only frequently; she should engage in no work at unprotected heights and should have no direct exposure to vibrations. Additionally, work is restricted to basic one-to-three step tasks; and interaction with the general public can be only brief and incidental.

(Tr. at 25-31, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of her past relevant work. (Tr. at 31, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 31-32, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1970, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (Tr. at 31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a food sorter, folder, or polisher at the sedentary, unskilled exertional level. (Tr. at 31-32, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 32, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, she argues that the ALJ erred by failing to properly weigh the opinions of treating and consulting medical sources. (ECF No. 15 at 5). In particular, Claimant contends that the ALJ disregarded or discounted statements provided by Jeremy Klein, M.D., Timothy Gregg,

M.D., and Megan Green, Psy.D., without reasonable justification and explanation. According to Claimant, these medical source statements, when read as a whole, overwhelmingly establish that Claimant is "an individual incapable of substantial gainful activity." (*Id.* at 6). Claimant asserts that the ALJ violated a Social Security Ruling ("SSR") that required him to give greater weight to treating and examining consultants and compounded that error by failing to consider SSR 96-9p, which discusses the impact of mental deficits on the unskilled, sedentary occupational base. (*Id.* at 6-8).

Second, Claimant challenges the ALJ's decision to ignore testimony provided by the vocational expert, which confirmed that an individual with Claimant's limitations was incapable of gainful employment. Claimant concedes that this testimony was given in response to a hypothetical question that incorporated Dr. Klein's medical source statement, but she argues that Dr. Klein's opinions are consistent with the great weight of the evidence. Accordingly, the ALJ erred by rejecting a vocational opinion that properly took into account all of Claimant's limitations. (*Id.* at 8).

In response, the Commissioner points out that an ALJ is not required to accept a medical source opinion, including that of a treating physician, when the opinion lacks medically acceptable clinical and diagnostic support, or is inconsistent with other substantial evidence. (ECF No. 16 at 10-14). The Commissioner asserts that, here, the ALJ considered the opinions of each medical source and provided clear and sound reasons for either accepting or rejecting specific statements. In the Commissioner's view, the ALJ did not disregard any of the medical source's opinions in their entirety. Instead, the ALJ accepted opinions that were supported by the evidence and discounted opinions that were inconsistent, citing to discrete portions of the record

when explaining his findings. The Commissioner contends that, in doing so, the ALJ fully complied with all governing rules and regulations.

With respect to the testimony of the vocational expert, the Commissioner indicates that an ALJ is only required to accept vocational opinions that are based upon hypothetical questions, which include the limitations established by the record. (*Id.* at 14-15). Consequently, when the ALJ determined that Dr. Klein's opinions were too extreme given the evidence, the ALJ was not required to accept vocational opinions based upon Dr. Klein's statements. The Commissioner adds that an ALJ is always permitted to ignore vocational testimony in response to hypothetical questions that are more restrictive than the ALJ's RFC finding.

## V. <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to the disputed issued are summarized as follows.

### A. Treatment Records

On February 3, 2010, Claimant presented to Three Rivers Medical Center with complaints of pain in the left hip due to a work injury sustained six hours earlier, described as a "twisting" injury. (Tr. at 567-77). Claimant reported moderate pain, rating it as eight out of ten on a ten-point pain scale. The emergency room nurse assessed Claimant, noting that she ambulated independently and performed activities of daily living without assistance. On examination, Claimant had no tenderness to palpation of the cervical spine and no significant musculature spasm or paracervical tenderness. In addition, she had a full range of motion of the spine without pain. Examination of Claimant's left hip revealed painless full range of motion without

evidence of external trauma. Her left extremity appeared normal from distal to hip. An x-ray of the left hip and pelvis was negative for acute fracture or dislocation. Claimant was assessed with muscle strain to the left hip, provided prescriptions for Norflex and ibuprofen, and was discharged in stable condition.

Claimant telephoned Valley Health Systems, Inc. ("Valley Health") on March 29, 2010 reporting that she had two seizures the prior evening and felt her current medication was no longer controlling her seizures. (Tr. at 581). Claimant requested a work excuse and a neurology referral. Claimant was provided a work excuse, but when informed of the cost of the neurology referral, Claimant declined as she reported she could not afford it at that time. The following month, on April 14, Claimant called again asking for a neurology referral and for prescription refills. (Tr. at 584). Claimant was provided refills for Protonix, Carbatrol, and Lovastatin.

On May 3, 2010, Claimant called Valley Health with increased concern about high blood sugar and having more seizures than normal. (Tr. at 589). Claimant had been fasting and asked to come in that day for a blood sugar test. A week later, on May 10, Claimant called again, requesting medication refills and inquiring about a neurology referral. She also asked if a physician could prepare a written note for her employer that would confirm Claimant required ten-minute breaks while on the job in order to eat, as she reported being lightheaded and feeling faint. (Tr. at 587). The attending physician noted that Claimant had not scheduled an appointment for examination in some time; therefore, he could not continue to write prescriptions without examining Claimant.

Claimant presented to Three Rivers Medical Center on July 29, 2010 with complaints of headaches that began two weeks earlier and were becoming

10

progressively worse. (Tr. at 550-566). Claimant described the pain as being located on the left side, causing aching and a feeling of pressure, and rating five on a ten-point pain scale. Claimant's headache was exacerbated by movement, accompanied by nausea, and nothing seemed to relieve the pain. A CT scan of the head was performed with negative results for acute intracranial process or hemorrhage. In addition, the radiologist did not find any bony abnormalities. While in the emergency room, Claimant received Stadol and Phenergan. Claimant was discharged to home in stable condition and was provided with prescriptions and a work status report advising her employer that Claimant would need to be off work for one day.

On September 27, 2010, Claimant telephoned Valley Health requesting that her hemoglobin be checked as she was having blurry vision, sweating, weakness, and irritability when hungry. (Tr. at 595). Claimant thought she might be diabetic. Laboratory work was ordered, and Claimant was advised to schedule an appointment.

On January 28, 2011, Claimant presented to Three Rivers Medical Center with complaints of pain in her left shoulder after lifting heavy boxes at work. (Tr. at 518-29). Claimant reported pain on movement as well as a painful joint. A physical examination revealed moderate tenderness of the shoulder when palpated and a decreased range of motion. An x-ray of the left shoulder was negative for acute fracture or dislocation. Mild cystic change within the lateral aspect of the clavicle was seen near the level of the greater tuberosity of the proximal humerus. The radiologist indicated that further evaluation of the finding could be done by MRI if clinically directed. Claimant was diagnosed with left shoulder strain, and was provided with medication for pain and a sling to stabilize her arm.

Claimant returned to Three Rivers Medical Center the following month on

February 5, reporting that she had slipped on a slick surface at a gas station and, although she did not lose consciousness, she felt immediate pain in her low back, left foot, head, and neck. (Tr. at 501-15). Other than those complaints and a complaint of headache, a review of systems was negative. On examination, Claimant was alert and oriented. Her left lower extremity exhibited tenderness on palpation and mild soft tissue swelling. A neurovascular examination was unremarkable. A CT scan of Claimant's head showed no abnormality of the brain or calvarium. The ventricles were of normal size and there was no evidence of intracranial hematoma or hemorrhage. A CT scan of the cervical spine showed no fracture or subluxation, while a CT scan of the lumbar spine showed mild degenerative changes without evidence of acute fracture. An x-ray of the left foot revealed no fracture or dislocation; however, the radiologist noted a somewhat severe talonavicular and moderate calcaneocuboid osteoarthritis. An x-ray of the left ankle reflected no acute bone or joint abnormality, although there was some subtalar joint degenerative change and degenerative arthritis. Claimant was assessed with a fall resulting in acute cervical and lumbar strain and ligamentous sprain of the left ankle. She received medication and crutches, and was released in stable condition.

On September 28, 2011, Claimant was examined at Valley Health with complaints of right heel pain. She also requested medication refills. (Tr. at 612). At this visit, Claimant weighed two hundred forty-one pounds and her blood pressure measured 140/98. Her physical examination was unremarkable. The examining physician documented that Claimant was not taking lipid or blood pressure medications at present. The physician diagnosed Claimant with osteoarthritis, gastroesophageal reflux disorder ("GERD"), hypertension, hyperlipidemia, plantar

fasciitis, and seizure disorder. She requested a prescription for Feldene to treat osteoarthritis and received various prescriptions for her chronic conditions.

On January 30, 2012, Claimant presented to Pathways, Inc., ("Pathways"), for treatment of depression and anxiety. (Tr. at 627-30). Claimant told Phillip J. Manilla, M.S., that she had a twelfth grade education and had stopped working the prior year after sustaining a fall that exacerbated problems with her feet. She reported she had "club feet-both feet." Claimant described "lose[ing] control," and feeling anxious and nervous when she could not perform a task to perfection. She added that family issues involving her children had made her depressed and anxious for the past two years, and her symptoms were becoming progressively worse, causing her to pull her hair, punch her leg, hiccup, and not be able to "get her words out." Claimant also reported frequent panic attacks. She listed her symptoms as sleep disturbances, feelings of guilt and hopelessness, irritability, no energy, difficulty concentrating, anxiety, heart palpitations, fear of losing control, somatic complaints, restlessness, compulsiveness, and poor concentration.

On examination, Claimant made good eye contact and was cooperative and attentive. Her speech was normal, and she had no memory impairment. Claimant demonstrated coherent thought processes; however, her affect was constricted and her mood was anxious and depressed. Claimant had normal psychomotor activity, although Mr. Manilla made a note under the category of psychomotor activity that Claimant had hiccups. Her judgment and insight were normal. Claimant relayed that from age seven to age sixteen, she attended outpatient counseling that began after she was removed from her mother's custody. At age sixteen Claimant was hospitalized for approximately four months as her grandmother "thought she might have a MI [mental

illness] like her mother." Claimant reported her current symptoms impaired her family relationships to the "extreme," impaired her job "quite a bit," did not affect friends, peer relationships or finances, but had a "moderate" effect on hobbies, interests, and activities. Claimant also felt her symptoms moderately interfered with her ability to concentrate and control her temper. Mr. Manilla assessed Claimant with major depressive disorder, single episode, moderate; and panic disorder without agoraphobia. Claimant's Global Assessment of Functioning ("GAF") score was 52.[2] Claimant said her family physician prescribed Zoloft for her and she requested to see the nurse at Pathways for a medication evaluation.

On February 6, 2012, Claimant's spouse contacted Mr. Manilla requesting information concerning Claimant's psychological evaluation. (Tr. at 710). He informed Mr. Manilla that Claimant appeared to have a learning or intellectual disability. Mr. Manilla reported that Pathways could offer a psychological evaluation that would include IQ testing and screenings for possible learning disabilities, which they could discuss at her next appointment. Mr. Manilla transferred Claimant's care to Pathways therapist, Juanita Goble, as of that date.

The following week, on February 15, Claimant presented for therapy with Ms. Goble. (Tr. at 711). Claimant signed a release allowing her husband to stay in the room

---

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013). GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

during her sessions. Claimant's husband told Ms. Goble that Claimant had trouble dealing with issues, did not handle stress well, and had "ticks" when under stress. Claimant's husband requested a psychological evaluation to rule out learning disabilities. The Claimant told Ms. Goble she was embarrassed by her "ticks" and complained of family issues. Claimant tended to isolate herself and did not like going out in public as she felt people looked at her and judged her. During the session, Claimant was attentive; however, she made sporadic eye contact and her husband answered some questions posed to Claimant on her behalf. Claimant was assessed with major depressive disorder and panic disorder.

Claimant returned on February 20, 2012 for therapy with Ms. Goble and an initial psychiatric assessment by Sheila K. Short, APRN. (Tr. at 635, 712). Nurse Short documented that Claimant's spouse sent Claimant to Pathways for symptoms of depression, anxiety, and outbursts of temper. (Tr. at 635). Although her symptoms had been present for two years, Claimant reported that she had been "losing control" during the past four months, and when under stress, she hiccupped and belched. Her current prescribed medications included Carbatrol, Lipitor, Feldene, Benicar, and Zoloft; however, as of this visit, Claimant had not started taking Zoloft. Claimant reported to Ms. Goble that her family physician had provided her with a prescription for Zoloft that she hoped to begin taking that day. Claimant expressed being easily irritated with family and complained of family, financial, parenting, and health issues. During this session, although cooperative and attentive, Claimant often looked at her husband to answer questions posed to her by Ms. Goble. Claimant's treatment plan remained unchanged.

Claimant returned to Ms. Goble on March 12, 2012. (Tr. at 712). Ms. Goble noted

that Claimant continued to take her prescribed medication and would receive outpatient therapy. Claimant's GAF score remained unchanged at 52. One month later, on April 2, Claimant presented to Sheila K. Short, APRN, for medication management. (Tr. at 634). Nurse Short documented that Claimant had improved, even though she had only been taking the prescribed medication for the past two to three weeks. Claimant told Nurse Short she was doing "much better."

Claimant participated in three additional counseling sessions and two medical management appointments in 2012. (Tr. at 631-32, 633, 641, 713-14, 715). On May 17, 2012, Claimant asked for an increase in her medications as she continued to worry and was irritable. On July 9, 2012, Claimant told Ms. Goble she felt "really anxious" and continued to complain of family, financial, and health issues. (Tr. at 713). Claimant lamented about owing child support with no means to pay, as well as having worked by cleaning a house and then not being able "to walk for four days." Claimant also reported problems making decision, controlling her emotions and having guilt over not seeing her biological children for more than a year; however, she was getting ready to see them soon and felt very excited at the prospect. Claimant confirmed she was taking her medication as prescribed with no side effects. On examination, Claimant was cooperative, but required redirection during the conversation and made intermittent eye contact. Ms. Goble did not make any changes to Claimant's treatment plan.

Claimant saw Nurse Short on July 30 and September 24 for medication management. (Tr. at 631-32, 641). On July 30, Claimant reported improvement, stating that her mood was stable and she was "doing well." Claimant relayed that she experienced "random" anxiety, most often related to stress about family issues, and that her hiccups had essentially stopped other than when she talked about issues that

caused stress. Claimant was advised to continue taking Zoloft and attend therapy. Claimant returned to Nurse Short on September 24 reporting that during her menstrual cycle, she had problems with her mood, was anxious, irritable, and agitated. Claimant was given a sample of Vistaril.

Claimant also presented to Ms. Goble on September 24 for counseling. Claimant was accompanied by her spouse, who informed Ms. Goble that Claimant was "doing great overall." (Tr. at 714). Claimant told Ms. Goble she felt better and was taking her medication correctly without side effects. Claimant appeared cooperative and attentive during the session. Claimant was advised to continue her mental health treatment. Less than one month later, on October 8, Claimant returned to Ms. Goble reporting she had been out of Zoloft for the past two days. (Tr. at 715). On a ten-point scale, ten being the worst, Claimant rated her depression at six to seven and anxiety at nine. Claimant requested Ms. Goble contact Kentucky Homeplace regarding assistance to Claimant in obtaining medication. Claimant's treatment plan remained unchanged.

On January 23, 2013, Claimant reported to Nurse Short requesting medication. (Tr. at 725-27). Claimant told Nurse Short that taking Zoloft had greatly reduced her depression. In fact, Claimant rated her depression as one out of ten. On examination, Claimant exhibited normal thought process; she had no suicidal or homicidal ideations; she had no delusions or obsessive thoughts; and her judgment and insight were fair. Claimant's concentration and attention were adequate and her mood was congruent. Claimant appeared to be doing well on her medication. Nurse Short recorded Claimant's status as improved. Claimant's diagnosis remained unchanged, as did her GAF score of 52. Claimant was advised to continue taking Zoloft, the dosage of which was increased to 100 milligrams.

Two days later, on January 25, Claimant presented to Ms. Goble for therapy. (Tr. at 716). Claimant asked for help with the Prescription Assistance Program ("PAP"), remarking she would not go to Kentucky Homeplace to apply. She added that she was not able to make any payments to Pathways for their services. Ms. Goble explained to Claimant that Pathways required payment for services and, therefore, Claimant had to make a minimal payment prior to her next visit. Ms. Goble noted Claimant was argumentative and irritable. However, Claimant did report that the prescribed medication provided good benefits in treating her depression. Ms. Goble helped Claimant with the PAP application for assistance in obtaining Zoloft.

On February 1, 2013, Ms. Goble completed a biopsychosocial assessment. (Tr. at 728-29). At age six, Claimant was removed from her mother's care and raised by her maternal grandparents. Claimant currently resided with her husband, her grandmother, and her stepdaughter. Claimant was not getting along well with her husband or her grandmother. Claimant wanted help from Pathways in controlling herself whenever she became anxious. Claimant's strengths were listed as average or above average functioning and good self-care. Ms. Goble found Claimant had a good prognosis with outpatient counseling and medication management. On February 18, Ms. Goble recorded that Claimant would continue to receive medication as prescribed by Nurse Short. (Tr. at 716). Claimant's diagnosis and GAF score remained the same.

On March 6, 2013, Ms. Goble and Nurse Short prepared a Mental Health Outpatient Treatment Plan signed by Claimant. (Tr. at 637-40). The plan for treatment of Claimant's depression included alleviating her depressed mood and restoring her to her prior level of effective, daily function. Treatment entailed Claimant continuing to take the prescribed psychotropic mediation responsibly. The treatment plan for

Claimant's phobia, panic, and agoraphobia included providing Claimant with coping skills and identifying and replacing cognitive beliefs and messages that mediate anxiety response on a daily basis. Ms. Goble and Nurse Short estimated that the outlined treatment for Claimant's diagnosis of major depressive order, single episode, moderate and panic disorder without agoraphobia, would take one year. At this assessment, Claimant's GAF score remained at 52.

On May 14, 2013, Ms. Goble wrote to Claimant advising Claimant had not participated in therapy since January 2013 and requested Claimant contact Pathways for an appointment if she wished to continue treatment. (Tr. at 717). One month later, on June 17, Ms. Goble prepared a discharge summary noting that Claimant did not respond to a letter of termination of treatment. (Tr. at 730-31). One week later, on June 24, Ms. Goble confirmed Claimant did not respond and, therefore, Claimant's treatment at Pathways was terminated. (Tr. at 717).

On January 8, 2014, Claimant presented to Louisa Family Practice to establish medical care with Dr. Jeremy Klein. (Tr. at 658-60). Dr. Klein indicated that Claimant had limited insight, making it very difficult to diagnose and treat her. Claimant's medical history included bilateral club feet with surgery as a child, but with no recent treatment; epilepsy, with the last seizure occurring eight months prior and no recent neurological evaluation; possible Tourette's syndrome; and bilateral wrist pain, more so on the right, with symptoms that appeared subacute and fairly chronic. Dr. Klein recorded that Claimant had previously taken medication for treatment of GERD; however, Claimant reported her symptoms had improved of late. At that time, Claimant was taking Carbatrol for treatment of seizures, and Feldene, but was no longer taking medication for treatment of hyperlipidemia.

On examination, Claimant was mildly overweight (two hundred nineteen pounds), and in no acute distress. Her physical examination was unremarkable. Dr. Klein diagnosed Claimant with epilepsy, without intractable epilepsy; talipes not otherwise specified, congenital; irregular menstruation; hyperlipidemia; and Gilles De La Tourette disorder awaiting evaluation by another physician. Dr. Klein recommended that Claimant schedule a neurology consultation for evaluation and management of seizures, referred Claimant to an orthopedist for treatment of talipes, ordered laboratory work, and noted he would await the results of a psychiatric evaluation regarding Tourette's syndrome. Claimant was told to return in one month.

Claimant returned to Pathways on January 28, 2014. (Tr. at 698-704, 718). Ms. Goble noted that Claimant was currently receiving treatment for depression, anxiety, and Tourette's syndrome from Dr. Light who prescribed Buspar and topiramate. Claimant had a history of mental illness on the maternal side; her mother had diagnoses of schizophrenia and depression. In addition, Claimant's sister and brother had mental health issues. Claimant told Ms. Goble that she had received level four accommodation throughout her school years, because she had a learning disability. Claimant's symptoms included depressed mood, lack of interest, sleep issues, guilt, hopelessness, worthlessness, difficulty concentrating, loss of energy, anxiety, heart palpitations, shaking, fear of losing control, chills, hot flashes, restlessness, poor concentration, loss of temper, and limited attention span. On mental examination, Ms. Goble found Claimant attentive, with normal speech and coherent thoughts; however, her remote memory was impaired based on Claimant's complaints of short and long-term memory issues. Claimant's psychomotor activity was listed as "fidgety/restless" although she was oriented to place and time, presented with full range affect and was

deemed reliable. As for functioning, Claimant reported her current symptoms had "extreme" effect on her marriage, relationships, family, friends, peers, financial situation, and her ability to concentrate. Her symptoms caused "moderate" effect on her physical health and activities of daily living; however, there was no impact on function with hobbies, interests, or activities. Claimant was assessed with major depressive disorder, single episode, moderate; anxiety disorder, not otherwise specified; and Tourette's disorder and was given a GAF score of 50.[3] On February 10, 2014, Ms. Goble recorded Claimant's diagnosis and noted Claimant would continue to take medication as prescribed by Dr. Light as well as receive outpatient counseling as needed. (Tr. at 718).

Claimant presented for counseling with Ms. Goble on February 24, 2014. (Tr. at 719). At this time, Claimant's medication regimen included Zoloft and Buspar. Claimant told Ms. Goble that she was previously admitted to the hospital as she had an "extreme, rare" reaction to Topomax. Claimant rated her anxiety as four out of ten and her depression as seven to eight. During this session, Claimant was cooperative and attentive, very loquacious, taking her medication as prescribed and working on goals as set out in treatment; however, Claimant made only sporadic eye contact. There was no change made to Claimant's treatment plan at this session.

On March 10, 2014, Claimant returned to Dr. Klein for follow-up, having no new complaints. (Tr. at 661). Claimant reported an episode of "partial blindness" presumably related to the prior adverse medication reaction. She indicated that the symptoms had resolved. At this visit, Claimant's medication list included

---

[3] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

Carbamazepine, Buspirone, Zoloft, and Mobic. Claimant weighed two hundred twenty-nine pounds with a recorded blood pressure of 140/82. On examination, Claimant was overweight, but in no acute distress. Dr. Klein advised Claimant that she had borderline hyperlipidemia and discussed her diet. She was told to follow up in six months. Dr. Klein recorded Claimant's other chronic conditions, but stated that she was receiving assessment and treatment for those conditions from other physicians.

Claimant returned to Ms. Goble on March 28, 2014 remarking that her current medications included Zoloft and Buspar; her prescribing physician had increased Buspar and was "weaning" her off Zoloft. (Tr. at 720). During the session, Claimant was cooperative, attentive, and smiled a lot, although her eye contact was sporadic. Claimant rated her depression as three out of ten and anxiety at nine. Claimant reported there was an active warrant for her arrest due to non-payment of child support. Her treatment plan remained unchanged.

On July 2, 2014, Claimant returned to Dr. Klein complaining of an abdominal mass and upper left quadrant pain. (Tr. at 662-63). Claimant told Dr. Klein that she was examined at the hospital and was told she did not have a hernia, but might have a lipoma. Claimant requested a surgical referral. She also complained of amenorrhea and requested a referral to a gynecologist. Dr. Klein noted that Claimant apparently had bilateral carpal tunnel syndrome as she wore splints and was requesting a new prescription for them. He referred Claimant for surgical and gynecological consults, ordered a mammogram, and prescribed splints for both wrists.

On July 8, 2014, Ms. Goble wrote to Claimant enquiring as to whether Claimant wished to continue therapy, as she had not participated since March. (Tr. at 721).

On July 17, 2014, Claimant presented for Michelle Murray, DPM, with a

complaint of clubfoot present since birth. (Tr. at 664). Claimant told Dr. Murray she had surgery for this condition as a child, including bone grafts from the hips into the ankles, but as her parents were involved in a custody battle, treatment for this condition was not continued. Claimant reported walking on the side of her foot. On examination, Claimant ambulated independently, was alert and oriented, with no sign of anxiety or depression. Her dorsalis pedis pulses and posterior tibial pulses were 2/4. Capillary return appeared instantaneously, and neither varicosities nor skin color changes were seen. When testing bilateral range of motion, Dr. Murray found Claimant to be limited on the left side, although muscle strength was within normal limits. Claimant showed no evidence of discomfort when her feet were manipulated. Her left foot was "C" shaped and in definite varus. Claimant ambulated on the side and forefoot of the left foot. Range of motion was tight with the Achilles and dorsiflexion range of motion of the ankle increased by bending the knee. The right foot was more planus, although on ambulation, Claimant hyperextended the great toe. A neurological examination showed no gross sensory deficit with light touch. Her sharp and dull sensations were within normal limits. No xerosis, fissures, or cellulitis was found in the integumentary examination. Claimant was assessed with Talipes Equinovarus of the left foot and received an order for an x-ray of the left foot. Dr. Murray discussed possible corrective surgery, and Claimant and her husband indicated they would consider it.

Ms. Goble completed a discharge summary on July 22, 2014, as Claimant had never responded to her earlier letter of inquiry. (Tr. at 696-97). Ms. Goble completed a case note on July 28, 2014 confirming Claimant had not responded to the question of continued counseling. (Tr. at 721).

Claimant returned to Dr. Murray on October 23, 2014 to discuss possible surgery to the left foot. (Tr. at 665). Claimant was examined and the results mirrored those at her last appointment. Although Claimant and her husband had several questions regarding surgery, the office record contained a hand-written note indicating Claimant had canceled the surgery and had not yet responded back to Dr. Murray.

On January 12, 2015, Claimant returned to Pathways for counseling with Ms. Goble. (Tr. at 705-09, 722). At this visit, Claimant's medication regimen included Cymbalta, Buspar, Neurontin, Carbatol, and a stool softener. Claimant received treatment for mood disorder and depression by Dr. Light and informed Ms. Goble she believed she had a learning disability. Claimant's spouse reported that Claimant was fatigued and he did not believe her medication helped her problems. He described Claimant as getting out of breath easily, shaking, having heart palpitations and panic attacks. Claimant reported being depressed at times due to issues with her children, describing the depression as always constant, but some days were worse.

On examination, Claimant appeared friendly and cooperative making good eye contact. She was attentive with normal speech, full range affect, and anxious mood. Her psychomotor activity was recorded as fidgety and/or restless. As for functioning, Claimant reported her current symptoms had an "extreme" effect on her financial situation, physical health, activities of daily living, ability to concentrate and control her temper, and a "moderate" effect on her marriage, relationships, family, friends, peers, hobbies, interests and activities. Claimant was assessed a GAF score of 50 and agreed to continue with counseling. However, on February 2, 2015, Ms. Goble noted that although Claimant had scheduled an appointment for counseling, she did not appear for the appointment and Ms. Goble was unable to contact Claimant as the

phone number provided to Ms. Goble indicated the voice mailbox was full. (Tr. at 722).

On February 9, 2015, Claimant presented to Taylor Chiropractic Health Center to complete a patient history listing complaints of carpal tunnel syndrome, headaches, and back pain ongoing for several years. (Tr. at 671). Claimant also reported that she was born with clubfoot, making it difficult for her to walk on uneven surfaces. Claimant described having pain that was sharp, burning, and rated ten on a ten-point pain scale, which was accompanied with tingling, numbness, aching, shooting pain, stiffness, and swelling. Claimant told Dr. Taylor that the pain interfered with all of her daily routine, stating that her wrists hurt the most at night. X-rays were taken of Claimant's cervical and lumbar spine. (Tr. at 672, 675). The cervical films showed a reversed cervical curve; broken George's line at C4-5 of the cervical spine; decreased disc space at C5-6, C6-7; anterior osteophyte formation on endplate C5 inferior and C6 superior; and a C7 superior head tilt. The lumbar spine x-ray revealed un-leveling rotations of spinouses to the right, decreased disc space at L4-5, L5-S1, and osteophyte formation at the L5 and S1 endplate.

On examination, Claimant was pleasant and her mood was within normal limits. Her upper extremities were positive for forward head bend and the spinal erectors, hamstrings, quadriceps, hip flexors, and uotbial bands were tight. While seated, Claimant's carotid bruit, cervical compression, and distraction were negative. Her hand grasp was negative and Hoffman's sign was absent. Claimant's biceps, brachial radialis, and triceps were all within normal limits. Claimant's cervical flexion was positive with pain at forty degrees; the extension was positive with pain at forty-five degrees; right and left lateral flexion positive with pain at forty degrees; and right and left rotation positive with pain at seventy degrees. Bilateral knee bends were within

normal limits; however, bilateral heel standing and tandem stance was found to be abnormal. Claimant's lumbosacral flexion was positive for pain and crepitus at fifty degrees; extension and right and left lateral flexion were positive for pain and crepitus at seventy degrees. A few days later, on February 13, Claimant asked Dr. Taylor for an x-ray of her back due to worsening pain in the mid back area. (Tr. at 680). An x-ray of the thoracic spine was performed and showed a scoliosis type curvature in the thoracic spine eleven degrees, left shoulder higher, as well as multiple disc space narrowing with osteophyte formation at the endplates. (Tr. at 673).

Claimant returned to Dr. Klein on March 20, 2015 reporting that she might have scoliosis as she had seen a chiropractor who performed x-rays. (Tr. at 666-69). Claimant thought her left ribs might be protruding which in turn caused her left leg to be shorter than her right leg. She wanted to see a particular orthopedist, but could not remember the doctor's name. As noted in the past, Dr. Klein recorded that it was difficult for him to obtain the details of Claimant's medical history or her complaints. At this visit, Claimant weighed two hundred forty-nine pounds with a blood pressure of 140/80. Claimant appeared in no acute distress; however, Dr. Klein documented that Claimant had frequent outbursts due to Tourette's syndrome. Dr. Klein diagnosed Claimant with borderline hyperlipidemia, congenital talipes, GERD, scoliosis, borderline anemia, hypocalcemia, and elevated glucose. He recommended a sensible diet to reduce hyperlipidemia, prescribed Protonix for treatment of GERD, ordered an x-ray of the thoracic spine, prescribed Ferrous Sulfate for treatment of borderline anemia, and ordered laboratory work.

Claimant presented to Three Rivers Medical Center that same day for x-ray of the thoracic spine. (Tr. at 670). The x-ray revealed levoconvex scoliosis centered at the

mid to lower thoracic spine. The radiologist concluded there were no other acute findings.

On March 24, 2015, Claimant presented to Three Rivers Psychiatry reporting that Cymbalta made her "too bitchy." (Tr. at 684). The physician noted that Claimant's complaints about the medication appeared to be situational rather than organic, so a change of medication was deemed unnecessary. On examination, Claimant was oriented, with normal attention span, concentration, speech, judgment, and recent and remote memory. Claimant was given prescriptions for Buspar and Cymbalta.

On April 1, 2015, Claimant returned to Three Rivers Medical Center for an x-ray of the dorsal and lumbar spine due to chronic back pain. (Tr. at 685-86). The x-ray of the dorsal spine showed mild left convex curvature of the lower thoracic spine. The alignment was stable compared to a March 20 x-ray. The vertebral body and disk space heights were within normal limits. The radiologist deemed the results as a stable examination, showing mild thoracic levoscoliosis but no acute bony abnormality. The x-ray of the lumbar spine, compared to one taken on January 20, 2014, revealed moderate degenerative disk space narrowing at both L4-5 and L5-S1 with mild endplate osteophytic spurring. The vertebral heights were maintained. The radiologist concluded this film also reflected a stable examination, with the outlined degenerative changes.

Claimant returned to Pathways for counseling with Ms. Goble on April 7, 2015, reporting her doctor had increased Cymbalta the week prior. (Tr. at 723). Claimant complained of family issues and talked about some childhood memories that might be contributing to her depression and anxiety. Coping mechanisms were discussed and Claimant was encouraged to be as active as possible.

On April 21, 2015, Claimant returned to Ms. Goble and discussed her recent disability hearing as well as family and economic stressors. (Tr. at 724). Claimant continued to take her medication as prescribed. Ms. Goble made no change to Claimant's treatment plan.

**B. Opinion Evidence**

On August 2, 2011, Megan L. Green, Psy.D, completed a Psychological Evaluation

at the request of the Department of Disability Determination Services ("DDS"). (Tr. at 599-602). Claimant provided a history of having been removed from her mother's care at age six due to her mother's mental illness, being raised by her grandmother, and currently residing with her grandmother, her husband, and stepdaughter. She described her relationship with family as "okay," and she had some meaningful friendships outside of family. Claimant completed high school, although she had trouble reading and spelling and was placed in special education classes in all subjects. Claimant told Dr. Green that her grandmother had to read the directions to her whenever she cooked, and she did not manage household finances because of her problem with reading. Claimant was last employed in January 2011, but quit her job at McDonald's due to pain in her feet. Claimant told Dr. Green she "doesn't do much because it is hard for [her] to walk." Claimant took care of her stepdaughter and the family pets. While she could complete some household chores, she really could not do "anything because her bones hurt too much." Most of Claimant's time was spent keeping her grandmother company. Claimant reported no prior mental health treatment, substance abuse issues, or legal problems.

On examination, Claimant appeared alert, oriented in all spheres, friendly and

cooperative. Claimant's thought process, thought content, and psychomotor activity were unremarkable. Claimant displayed a euthymic mood and appropriate affect. Her insight and judgment were adequate and her attention and concentration were intact. Claimant showed normal remote, short-term, and immediate memory. Claimant took the Wechsler Adult Intelligence Scale, 3rd Edition ("WAIS-III"), and had a verbal IQ score of 72, performance IQ score of 75, verbal comprehension and perceptual organization score of 76, with a full scale IQ of 71. Dr. Green found the test results indicated an overall level of intellectual functioning that fell within the borderline range. She felt that Claimant had given her best effort on the tests; thus, the test scores were valid. Dr. Green opined that Claimant had a significant reading disorder, which made it very difficult for her to understand and carry out written instructions; however, Claimant was capable of understanding, remembering, and carrying out verbal instructions. Claimant was also capable of responding appropriately to supervision and sustaining adequate concentration, persistence, and pace as well as being able to adapt to change. Claimant was assessed with Reading Disorder and Borderline Intellectual Functioning. She received a Global Assessment of Functioning ("GAF") score of 65.[4] Dr. Green opined that Claimant would not be able to manage her own benefits due to problems with reading. In addition, Dr. Green found that Claimant's borderline intellectual functioning and cognitive functioning would be stable over time and would not change.

On August 31, 2011, Jane Brake, Ph.D., completed a Psychiatric Review

---

[4] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

Technique under the listing of 12.02 (organic mental disorders). (Tr. at 113-15). Dr. Brake found Claimant had mild limitations with activities of daily living and maintaining social function; however, Claimant had moderate limitations in maintaining concentration, persistence, and pace. There were no episodes of decompensation, and no evidence to establish the paragraph "C" criteria. Dr. Brake found Claimant partially credible in connection to Claimant's complaints of memory, concentration, completing tasks, understanding and following directions. Dr. Brake based her rating of Claimant's credibility by reviewing the medical as well as the non-medical case findings. Dr. Brake observed that Claimant alleged problems with lifting, bending, standing, walking, sitting and climbing stairs; however, these difficulties were not supported by objective findings. While Claimant's complaint of pain was considered separately, Dr. Brake opined that Claimant's pain did not cause her residual functional capacity to be further reduced.

Dr. Brake also completed a Mental Residual Functional Capacity Assessment, finding Claimant had no limitations with understanding and memory; however, she had some limitations with sustained concentration and persistence. (Tr. at 117-18). Dr. Brake opined that Claimant was not significantly limited in her ability to carry out very short and simple instructions; carry out detailed instructions; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple, work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms; however, Claimant was moderately limited in her ability to maintain attention and concentration for extended periods. Claimant had no

limitations with social interaction but did have minor adaptation limitations. She was moderately limited in her ability to respond appropriately to changes in the work setting. Under the additional explanation section of the form, Dr. Brake found Claimant's allegation as to problems with her memory, concentration, completing tasks, understanding and following directions to be only partially credible. Dr. Brake based this opinion upon information in the medical and non-medical case findings in addition to noting Claimant did not demonstrate any mental limitations during her telephonic claim interview. Claimant stopped working in 2011 due to physical complaints, and although she had a history of special education with reported learning problems, the current test scores revealed a GAF of 60 and a full scale IQ of 71. Dr. Brake found that despite Claimant's mental limitations, Claimant could understand and carry out simple familiar instructions and procedures that required brief learning periods; she could concentrate and persist at simple, familiar tasks requiring some independent judgment and involving minimal variations in two hour segments; she could relate adequately to others in social interaction; and she could adapt adequately to situational conditions and changes with reasonable support and structure.

On September 20, 2011, Carlos X. Hernandez, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 115-17). Dr. Hernandez found that Claimant had no exertional limitations, but did have postural limitations. Claimant had unlimited ability to climb ramps or stairs, balance, stoop, crouch or crawl; however, she should never climb ladders, ropes or scaffolds. Dr. Hernandez based these findings on Claimant's history of seizures. Claimant had no manipulative, visual, or communicative limitations. Claimant had unlimited ability for exposure to extreme cold or heat, wetness, humidity, noise, vibrations, fumes, odors, dusts, gases, and poor

ventilation; however, Claimant needed to avoid all exposure to hazards, such as machinery or heights. Dr. Hernandez noted that Claimant was alleged to have a left clubfoot; however, he did not find any documentation in the file to support this allegation, adding that an x-ray of the left foot and ankle were performed in February 2011 due to complaints of foot pain that revealed normal findings. Dr. Hernandez further opined that Claimant alleged problems lifting, bending, standing, walking, sitting and climbing stairs; nevertheless, he felt these allegations were not supported by the objective findings and were not considered credible. Although Claimant's complaints of pain were assessed on their own, Dr. Hernandez did not believe this further reduced Claimant's RFC. On November 2, 2011, at the reconsideration level, Lisa Beihn, M.D., affirmed the initial assessment. (Tr. at 145-47).

On October 29, 2011, Angeles Alvarez-Mullins, M.D., completed a Psychiatric Review Technique. (Tr. at 143-45). Claimant was found to have mild limitations in restrictions of activities of daily living and maintaining social functioning; moderate limitations in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation. There was no evidence of the paragraph "C" criteria. Dr. Alvarez-Mullins found Claimant to be partially credible.

By a report of the same date, Dr. Alvarez-Mullins completed a Mental Residual Functional Capacity Assessment. (Tr. at 147-49). Dr. Alvarez-Mullins stated that Claimant did not have any limitations with understanding and memory. She was found not significantly limited in her ability to carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or

in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods; nonetheless, Claimant was moderately limited in her ability to carry out detailed instructions. Dr. Alvarez-Mullins supported his findings by explaining that Claimant was capable of understanding and remembering simple instructions, albeit preferably given to Claimant by verbal or by demonstration as opposed to written form. In addition, Claimant was found to have intact concentration and attention allowing her to be able to complete tasks within an appropriate time period, as well as maintain a work routine without the need for special supervision. Dr. Alvarez-Mullins opined that Claimant was also capable of completing a regular work schedule. Claimant was not significantly limited in her ability to interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Dr. Alvarez-Mullins opined that Claimant was capable of appropriate social interaction with low demand. As for adaptive limitations, Claimant was found not to be significantly limited in her ability be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; set realistic goals or make plans independently of others; however, Claimant was moderately limited in her ability to respond appropriately to changes in the work setting. Dr. Alvarez-Mullins based these findings on Claimant's intellectual limitations and lack of ability to read well. Because of this, Dr. Alvarez-Mullins felt Claimant might

require some leeway in adjusting to changes in her work routine.

On December 12, 2012, Claimant underwent a consultative examination conducted by Timothy H. Gregg, M.D. (Tr. at 643-45). Claimant alleged disability due to "clubbed foot, learning disabilities." Claimant told Dr. Gregg that both of her feet hurt constantly, with pain in the left foot worse than the right foot. Claimant reported having undergone foot surgery when she was very young, and she did not walk until age four. Claimant also told Dr. Gregg that she received treatment for seizures as a child; however, she no longer took anticonvulsant medication. Claimant estimated she could stand and/or walk thirty minutes to one hour at a time, but would have to rest for a considerable amount of time thereafter. Claimant estimated she could occasionally lift twenty pounds.

Dr. Gregg noted that while in the waiting room, Claimant emitted what appeared to be paroxysms of strange, involuntary squawking that sounded like a parrot. Dr. Gregg found this behavior to be suggestive of Tourette's syndrome; however, Claimant denied any specific diagnosis of that condition. During the examination, Claimant emitted the same unusual squawking noises at the beginning of the interview, stopped after approximately ten minutes, and then resumed squawking near the end of the examination. Dr. Gregg was unable to determine if the squawking was voluntary or involuntary, although his impression was that it was involuntary.

On examination, Claimant weighed two hundred two pounds with a blood pressure of 136/84. She appeared somewhat withdrawn, but was cooperative. Claimant ambulated with a slow antalgic gait and did not require the use of an assistive device. There was tenderness in the mid plantar area bilaterally and below the medial and

lateral malleoli. Claimant had mild limitation in range of motion of the left ankle (ten degrees dorsi-flexion and ten degrees plantar flexion) and normal range of motion in the right ankle. The remainder of the joints in the upper and lower extremities had full range of motion, and there was no evidence of swelling, tenderness, deformity, or muscle atrophy. Claimant had ninety degrees lumbar flexion without any symptoms. A straight leg raise was negative bilaterally, both in the seated and supine positions. Claimant's cranial nerves were negative, and there was no focal motor, sensory, or reflex deficit with the exception of extensor hallucis longus weakness bilaterally. Claimant's bilateral grip strength was excellent. Tinel's sign was negative bilaterally. Claimant was not able to walk on her heels or toes, and she was unable to heel/toe walk or squat. The Romberg test was negative. Dr. Gregg diagnosed Claimant with residual limitations in standing and walking, secondary to bilateral foot surgery and possible Tourette's syndrome.

On the same day, Dr. Gregg completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (Tr. at 646-54). He found that Claimant could frequently lift and/or carry up to ten pounds; occasionally lift up to twenty pounds; stand or walk thirty minutes without interruption; and sit six hours without interruption. Claimant could sit or stand two hours in an eight-hour workday and walk six hours in an eight-hour workday. Claimant did not require a cane to ambulate. She could frequently reach overhead; reach all other directions; handle; finger; feel; and push or pull with either hand. Claimant could operate foot controls occasionally with either foot, but almost never bilaterally. Claimant could frequently balance; occasionally climb stairs or ramps; stoop; kneel; crouch or crawl; but never climb ladders or scaffolds. Claimant had no hearing or visual impairments. Claimant could

have frequent exposure to humidity, other environmental irritants, and vibrations. She could have occasional exposure to unprotected heights and moving mechanical parts, but was never to operate a motor vehicle. Claimant could be exposed to very loud noise described as jackhammer level. She could also shop; travel without assistance; ambulate without using an assistive device; use standard public transportation; climb a few steps at a reasonable pace with the use of a handrail; prepare simple meals; care for personal hygiene; and sort, handle, and use paper files. However, Claimant could not walk a block at a reasonable pace on rough or uneven surfaces. Dr. Gregg felt that Claimant's limitations would last for twelve consecutive months.

On April 9, 2015, Jeremy Klein, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 688-95). Dr. Klein designated Claimant's primary diagnosis as congenital talipes, and her secondary diagnoses as learning disabilities and anxiety with Tourette's syndrome. Dr. Klein found that Claimant could lift less than ten pounds occasionally to frequently; stand and/or walk less than two hours in an eight-hour workday; and periodically alternate sitting and standing to relieve pain or discomfort. Claimant was limited in both the upper and lower extremities with pushing and/or pulling. He opined that Claimant's upper extremity limitation was due to carpal tunnel syndrome. Claimant could not push or pull at all with her lower extremities. Dr. Klein explained these exertional limitations by stating that Claimant experienced pain in her back, legs, and feet. Dr. Klein added that the pain, when combined with Claimant's poor balance, entirely prevented her from climbing ramps, stairs, ladders, ropes or scaffolds; balancing; stooping; kneeling; crouching; or crawling. Claimant had unlimited ability to reach in all directions, including overhead, and to handle (gross manipulation); however, she was limited in her ability to finger

(fine manipulation) and feel. Claimant had no visual limitations. Claimant had no limitations with hearing, but was limited in her ability to speak due to Tourette's syndrome. Dr. Klein found that Claimant had unlimited ability for exposure to extreme cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation; however, she should never be exposed to hazards, such as machinery or heights. Dr. Klein opined that Claimant's symptoms were attributable to a medically determinable impairment, which was associated with the expected severity or duration. He felt the severity of Claimant's symptoms and their alleged effect on function was consistent with the total medical and non-medical evidence, including statements by Claimant and others, observations regarding activities of daily living and alterations of usual behavior or habits.

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585,

589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

Claimant contends that the ALJ failed to properly weigh the medical source statements in this case. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and

38

laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. Jul. 2, 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4) Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts

of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ explicitly considered all of the medical source statements and weighed them in accordance with Social Security rules and regulations. Looking specifically at the opinions of Dr. Klein, Dr. Gregg, and Dr. Green, which Claimant believes were unfairly treated by the ALJ, the undersigned **FINDS** that the ALJ properly examined each of these medical source statements, weighed them, and provided clear explanations for the weight given to them. The ALJ supplied references to the evidence to clarify and support his conclusions regarding the weight he gave to the opinions.

First, with respect to Dr. Klein, the ALJ acknowledged that Dr. Klein was a treating physician. (Tr. at 29). However, the ALJ noted that Dr. Klein had relatively few visits with Claimant. For that reason, the ALJ concluded that Dr. Klein's opinions were not entitled to the same evidentiary weight as would be afforded to an opinion from a physician with a treatment relationship of longer duration. Thus, the ALJ properly examined the length and frequency of Claimant's treatment relationship with Dr. Klein, as those are valid factors to consider when weighing a medical source statement. The ALJ further discounted Dr. Klein's opinions because neither his own clinical findings, nor the objective evidence, supported the opinions. Thus, the ALJ correctly assessed the supportability and consistency of Dr. Klein's opinions, as these factors are highly important in determining the weight to give to such opinions. The ALJ explained his reasoning, pointing out that Dr. Klein relied on Claimant's carpal tunnel syndrome as the basis for finding that Claimant was limited in the use of her hands. However, Dr. Klein's records contained no clinical findings corroborating functional deficits from carpal tunnel syndrome. (*Id.*). Moreover, Dr. Klein's statement regarding Claimant's hand limitations was inconsistent with clinical observations and

findings made by a consultative examiner who actually tested the functional capacity of Claimant's hands. The ALJ further noted that Dr. Klein relied too heavily on Claimant's subjective reports, accepting them uncritically. Based upon the weak foundation supporting Dr. Klein's opinions, the ALJ gave them only little weight.

The ALJ's treatment of Dr. Klein's medical source statement is supported by substantial evidence for several reasons. First, as the ALJ pointed out, Dr. Klein had no entries in his clinical record documenting an examination of Claimant's hands. Similarly, his diagnosis of carpal tunnel syndrome was based entirely upon history provided by Claimant. Dr. Klein did not conduct any testing for carpal tunnel syndrome, nor did he refer Claimant for such testing. He prescribed Claimant wrist splints at her request, not because he observed her having difficulty with the use of her hands. Second, Dr. Klein did not begin to treat Claimant until January 2014, approximately three years after the alleged onset of disability. Dr. Klein saw Claimant on only four occasions before completing her RFC assessment, and there is no notation in the record to indicate that Dr. Klein obtained Claimant's medical records from other health care providers. Further, Dr. Klein stated on more than one occasion that Claimant had limited insight, which made it difficult for him to diagnose and treat her. Therefore, the supportability of his opinions, which relied heavily on Claimant's subjective statements, is questionable. Third, Dr. Klein's statements contradict the objective findings of Dr. Gregg, who specifically examined Claimant's hands and documented no functional deficits. Taking the record as a whole, the ALJ provided well-supported and logical reasons for discounting Dr. Klein's RFC assessment of Claimant.

Looking next at the weight given by the ALJ to Dr. Gregg's opinions, the

undersigned initially notes that the ALJ provided a summary of Dr. Gregg's consultative examination findings and accepted their accuracy. (Tr. at 27, 29). The ALJ explained that Dr. Gregg's clinical findings were consistent with other evidence in the record, and they substantiated that Claimant could perform work within the sedentary exertional level. However, the ALJ rejected Dr. Gregg's opinion that Claimant could only frequently reach, handle, finger, feel, and pull. The ALJ indicated that Dr. Gregg's own physical examination of Claimant showed no limitations in the use of her hands. Dr. Gregg found Claimant to have normal range of motion, excellent grip strength, and a negative Tinel's sign bilaterally. The ALJ also pointed out that other portions of Dr. Gregg's RFC assessment were internally inconsistent in regard to Claimant's ability to sit and stand. For example, Dr. Gregg indicated that Claimant could sit for six hours uninterrupted, but could only sit a total of two hours in an eight-hour workday. He also stated that Claimant could stand for only two hours in an eight-hour workday, but could walk a total of six hours despite having a primary impairment of clubfoot. Given the contradictions in the RFC statement, the ALJ rejected many of Dr. Gregg's opinions, but gave great weight to his recorded findings.

Once again, the ALJ's treatment of this medical source's opinions is supported by substantial evidence. Dr. Gregg provided no basis for his determination that Claimant is limited to frequent use of her hands. This limitation is particularly confusing when considering the actual physical findings, which show no evidence of functional deficits in Claimant's hands. Dr. Gregg's opinions regarding Claimant's ability to sit, stand, and walk are equally confusing, because they simply make no logical sense. The ALJ correctly identified the inconsistences, addressed them, and resolved the conflicts. He based his RFC finding on Dr. Gregg's examination results,

rather than on his muddled RFC assessment form. By doing so, the ALJ appropriately assessed and weighed Dr. Gregg's medical source statement.

Lastly, the ALJ examined the findings and opinions of Megan L. Green, Psy.D. (Tr. at 28-29). The ALJ did not dispute Dr. Green's consultative examination findings, but did disagree with her conclusion that Claimant had a Reading Disorder. (Tr. at 29). Earlier in the written decision, the ALJ explained in some detail why he did not feel that Claimant's deficiencies in reading translated into functional impairment that would significantly affect her ability to work. (Tr. at 22). The ALJ emphasized that Claimant's educational records confirmed that she completed high school and received a diploma without taking special education courses. In addition, she was able to independently complete several of the disability forms, demonstrating written language capabilities, and she worked in the past at various daycare centers. While at the daycare centers, Claimant read to children and performed other tasks that were described by the vocational expert as "semi-skilled." (*Id.*). The ALJ stated that Dr. Green's diagnosis of Reading Disorder[5] was based entirely on the history provided by Claimant, in which she reported that she "couldn't read" and was placed in special education classes. Considering that Claimant's educational records and work history

---

[5] A diagnosis of Reading Disorder is based upon the following criteria:

A. Reading achievement, as measured by individually administered standardized tests of reading accuracy or comprehension, is substantially below that expected given the person's chronological age, measured intelligence, and age-appropriate education.

B. The disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills.

C. If a sensory deficit is present, the reading difficulties are in excess of those usually associated with it.

DSM IV at 48.

undermined Claimant's representations to Dr. Green, the ALJ discounted Dr. Green's opinion about Claimant's reading capability. Nevertheless, the ALJ accepted the other mental limitations suggested by Dr. Green.

The ALJ's treatment of Dr. Green's opinions similarly is supported by substantial evidence. As the ALJ indicated, Claimant's school records do not corroborate that she was enrolled in special education courses. (Tr. at 396). Contrary to the impression Claimant left with Dr. Green, Claimant's high school transcript from Falls Church, Virginia reflects that she received average grades in her reading and English courses. (*Id.*). Claimant was awarded a high school diploma, having satisfactorily passed all of the required curriculum. Also of note, Claimant apparently failed to inform Dr. Green that she had worked as a daycare attendant for many years. Claimant's intelligence testing reflects scores in the borderline range of intellectual functioning, a range of functioning that is consistent with a reduced ability to read. Dr. Green never expressly compared Claimant's reading achievement to the criteria comprising the diagnosis of Reading Disorder, nor did she explain the basis for her conclusion that Claimant's reading deficiencies were more than simply a reflection of her level of intellectual functioning.

In summary, Dr. Green's diagnosis rested primarily on the shaky foundation of Claimant's statements. The ALJ correctly considered the evidentiary support underlying all of Dr. Green's opinions, and when doing so, accepted some of them and rejected others. As such, the ALJ properly performed his role as the adjudicator. Ultimately, a claimant's RFC is an administrative finding. Even when an ALJ gives significant weight to a medical source's statement, the ALJ is not required to adopt every conclusion contained therein. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014

WL 671462, at *10 (D. Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D. Md. May 17, 2013)).

In a related criticism, Claimant contends that the ALJ failed to consider SSR 96-9p, which provides guidance on how to assess a claimant's ability to perform other jobs when the claimant has a RFC for less than a full range of sedentary work. SSR 96-9P, 1996 WL 374185 (S.S.A. Jul. 2, 1996). The SSR points out that such a RFC finding signifies "very serious limitations," but adds that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience." *Id.* at *1. The SSR goes on to explain that when a claimant can only do less than sedentary level work, the ALJ must consider how the claimant's individual deficits erode the occupational base. Furthermore, the SSR reviews the basic work activities that the ALJ must consider, including the mental activities highlighted by Claimant. The SSR suggests that "[i]n more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. *Id.* at *9.

Contrary to Claimant's contention, the ALJ did precisely as directed by SSR 96-9P. He analyzed Claimant's functional deficits, including her mental deficiencies, and constructed an RFC finding that accounted for her limitations. The ALJ also engaged the assistance of a vocational expert, who opined that Claimant could do various

sedentary level jobs despite her restrictions. Accordingly, the ALJ completed the requisite analysis and confirmed, with the assistance of a vocational expert, the availability of jobs for Claimant within the reduced sedentary occupational base.

Finally, Claimant criticizes the ALJ's rejection of some of the vocational expert's testimony; specifically, the vocational expert's statement that Claimant would be incapable of working if she had all of the limitations described by Dr. Klein. The undersigned **FINDS** Claimant's criticism to be without merit. In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993); *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted); *see also Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21

(4th Cir. 2005).

Here, the ALJ arrived at Claimant's RFC by assessing all of the evidence, including the opinions of Dr. Klein. The ALJ specifically rejected certain limitations propounded by Dr. Klein, including those that underlied the disputed testimony offered by the vocational expert. Given the undersigned's determination that the ALJ's RFC finding is supported by substantial evidence, the ALJ correctly disregarded testimony based upon an inaccurate and more limited RFC finding. When asked to assume a hypothetical individual with the RFC crafted by the ALJ, the vocational expert confirmed the presence of jobs in significant numbers in the national economy that Claimant could perform. Therefore, the undersigned **FINDS** that the ALJ did not err in his treatment of the vocational expert's testimony.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 15); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within

which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 21, 2017

Cheryl A. Eifert
United States Magistrate Judge